IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>UNITED STATES COMMODITY FUTURES<br>TRADING COMMISSION,</td><td>No. C 11-4577 CW</td></tr>
<tr><td>Plaintiff,</td><td>ORDER GRANTING THE<br>USCFTC'S MOTION<br>FOR SUMMARY</td></tr>
<tr><td>v.</td><td>JUDGMENT (Docket<br>No. 234), DENYING<br>CROMBIE'S CROSS-</td></tr>
<tr><td>JAMES D. CROMBIE,</td><td>MOTION FOR SUMMARY</td></tr>
<tr><td>Defendant.</td><td>JUDGMENT (Docket<br>No. 252) AND<br>DENYING CROMBIE'S</td></tr>
<tr><td>_____/</td><td>MOTIONS FOR LEAVE<br>TO FILE NEW<br>COUNTERCLAIMS AND<br>THIRD-PARTY CLAIMS<br>(Docket Nos. 191<br>and 194)</td></tr>
</table>

Plaintiff United States Commodity Futures Trading Commission (USCFTC) and Defendant James D. Crombie have filed cross-motions for summary judgment. Crombie also moves for leave to file new counterclaims and third-party claims. The Court took Crombie's motions for leave under submission on the papers. Having considered the papers submitted by the parties and their arguments at the hearing on the cross-motions, the Court GRANTS the USCFTC's motion for summary judgment and DENIES Crombie's cross-motion for summary judgment and his motion for leave to file new claims.

                              BACKGROUND

I. Facts

The USCFTC is an independent federal regulatory agency created by Congress to administer the Commodity Exchange Act (the Act) and to enforce its provisions. First Am. Compl. (1AC) ¶ 12;

Crombie's Answer to the 1AC (Answer) ¶ 12; see Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 273 (9th Cir. 1979).

The National Futures Association (NFA) is a private corporation that is registered as a futures association with the USCFTC pursuant to 7 U.S.C. § 21.  1AC ¶ 15; Answer ¶ 15.  The NFA has delegated responsibility for certain aspects of the regulation of certain futures professionals and entities that comprise its membership and their associated persons.  Id.  The NFA focuses primarily on the qualifications, proficiency, financial conditions, retail sales practices and business conduct of its members.  Id.

The NFA's members include commodity trading advisers (CTAs), who are defined under the Act generally to include persons who are in the business of advising others of the value or advisability of trading in items such as commodity futures contracts or who promulgate analyses or reports on these topics as a regular part of business.  1AC ¶¶ 15, 19; Answer ¶¶ 15, 19; see also 7 U.S.C. § 1a(12).

JDC Ventures, LLC is a California corporation incorporated in 2005.  1AC ¶ 18; Answer ¶ 18; Crombie Decl. ¶ 8, Ex. 7, Docket No. 252-2.[1]  JDC Ventures was registered as a CTA with the NFA from February 2009 to May 2010 and remains an active limited liability company within California at the present time, but "it does not

_____

[1] The exhibits attached to Crombie's declaration appear to mistakenly include two exhibits labeled as Exhibit 6 and do not include any exhibits labeled as Exhibits 5 or 7.  See Docket No. 252-2, 37, 59.  The first Exhibit 6 appears to be accurately labeled.  Docket No. 252-2, 37.  The second Exhibit 6 appears to have been mistakenly marked as Exhibit 6 instead of Exhibit 7, and will be referred to herein as Exhibit 7.  Docket No. 252-2, 59.

United States District Court
For the Northern District of California

have any business currently" and "hasn't had business in several years."  1AC ¶ 18; Answer ¶ 18; Crombie Decl. ¶ 8, Ex. 7; Robell Decl. ¶ 4, Ex. 3 (Crombie Depo.),[2] Docket No. 234-2, 88:5-13. Crombie states that he was the sole member of JDC Ventures from 2005 to 2011.  Crombie's Opp. and Cross-Mot. for Summ. J. (Cross-Mot.), 2.  JDC Ventures held itself out as an investment advisor registered with the NFA that utilized a proprietary quantitative model for trading commodity future contracts.  Robell Decl. ¶ 5, Ex. 4, Docket No. 234-2, 114, 121.

Paron Capital Management, LLC (Paron) was founded as a Delaware corporation in 2010 by Crombie, Peter McConnon and Timothy D. Lyons.  Robell Decl. ¶ 3, Ex. 2, Docket No. 234-2, 18. The Operating Agreement forming the company stated that it "was formed as JDC Trading, LLC on or about March 29, 2010," and that the name of the company was later changed to Paron.  Id.  In the Operating Agreement, Crombie agreed to transfer all property and assets of JDC Ventures, including those in its trading system, to Paron.  Id.  As part of the inducement for Crombie to transfer these assets to Paron and admit McConnon and Lyons, McConnon agreed to loan the company $300,000, with the understanding that Crombie would "immediately withdraw all of the proceeds of the Loan and use of all of such proceeds solely to settle that certain

---

[2] As explained in further detail below, separate litigation involving Crombie, Peter McConnon, Timothy D. Lyons and Paron Capital Management, LLC took place in Delaware Chancery Court. Depositions were taken during that litigation and a trial took place.  Excerpts of the transcripts from the depositions and trial in the Delaware case were submitted by both parties.  References to depositions taken in the Delaware action are indicated by the abbreviation "Del. Depo." and references to depositions taken in the instant action are referred to simply as "Depo."

judgment against Crombie and JDC in the matter of Paul D. Porteous v. James D. Crombie et al. filed in the Superior Court of California in the County of Ventura." Id.

Pursuant to the Operating Agreement, Crombie owned seventy-five percent of Paron, McConnon owned twenty percent and Lyons owned five percent. Id. at 24-25. Crombie was designated as the Initial Manager of Paron, and was given, with limited exceptions, "full and complete authority and discretion to make all decisions and determinations, and take or authorize all actions, which he deems appropriate" on behalf of Paron. Id. at 20.

During the period from August 2010 through March 2011, Paron used promotional material in the form of a PowerPoint presentation, known as the "Flip book," a monthly newsletter, and a due diligence questionnaire (DDQ) in order to solicit potential clients. 1AC ¶¶ 3, 22; Answer ¶¶ 3, 22.

In March 2011, acting on the basis of anonymous complaints that Crombie was advertising fictitious performance information and that he and JDC Ventures had been charged in several civil lawsuits in connection with loans made to them that totaled more than $1 million, NFA initiated an investigation of Paron pursuant to its authority delegated from the USCFTC. Robell Decl. ¶ 11, Ex. 10, Docket No. 234-3 (Aff. of Patrick Moongthaveephongsa, hereinafter Moongthaveephongsa Aff.), ¶¶ 3-4; see also 1AC ¶ 21; Answer ¶ 21. An NFA team led by Patrick Moongthaveephongsa began an onsite examination of Paron on March 21, 2011 and interviewed Crombie in a conference call on March 29, 2011. Moongthaveephongsa Aff. ¶¶ 4, 11, 16. Crombie states that the

United States District Court
For the Northern District of California

onsite examination lasted until March 23, 2011.  Crombie Decl.,
Ex. 90 (Crombie Aff.), ¶ 5.[3]

During its audit, the NFA obtained Paron promotional material
consisting of the Flip book, the newsletter and the DDQ.  1AC
¶ 22; Answer ¶ 22.  For historical information predating the
creation of Paron, the promotional materials represented the
performance of JDC Ventures.  Crombie Depo., 195:4-196:2; Robell
Decl., Ex. 5, 7 (Flip book stating, "The management company was
founded as JDC Ventures LLC in 2005 as a company solely owned and
managed by James Crombie as investment adviser and was re-named
Paron Capital Management LLC in May 2010 with three admitted
members.  This track record is inclusive of the live and verified
track record of the investment adviser as Managing Member of JDC
formerly and of PCM currently.").  The Flip book and newsletter
each claimed that JDC and Crombie had previously achieved annual
rates of return as high as 38.6% in 2008.  1AC ¶ 22; Answer ¶ 22.
The DDQ claimed that the total assets "managed/advised" by Paron
in 2011 were approximately $35 million, and that the largest
current account was $20 million.  Id.  Crombie admitted in his
answer here that the DDQ listed these figures incorrectly.  Answer
¶ 22.

The NFA requested that Crombie provide it with supporting
documentation for the historical returns cited in certain
promotional material for Paron.  1AC ¶ 23; Answer ¶ 23.  In
response, Crombie provided the NFA with certain documents,

---

[3] Crombie has submitted both a declaration signed under
penalty of perjury and a notarized affidavit, which is attached as
an exhibit to the declaration.

United States District Court
For the Northern District of California

including (1) monthly account statements or summaries purportedly
from Fimat USA, LLC; (2) monthly account statements or summaries
purportedly from Access Securities, LLC (Access); and (3) a
Trading Advisory Agreement (TAA) dated December 13, 2007,
purportedly signed by Richard Breck.  Moongthaveephongsa Aff. ¶ 6.
See also Robell Decl. ¶ 12, Ex. 11, 141 (emailed document from
Crombie to NFA personnel, stating, "On behalf of all PCM
Principals, Crombie provided the documents per the NFA's initial
requests."); Crombie Depo. 37:8-25 (testifying that he provided
the Fimat statements to the NFA); Answer ¶¶ 26, 28 (admitting to
providing the NFA with the Access statements and TAA).  The USCFTC
contends that these documents were fraudulent.  It also contends
that Crombie made a number of misstatements to the NFA during the
course of the investigation.

A. The Fimat statements

Crombie testified that the Fimat statements showed the
activity in two accounts held at that institution by SCR Financial
Group, Inc. that traded based on Crombie's futures trading
algorithm.  Crombie Depo. 37:21-38:5.  When Crombie provided these
documents to the NFA, he characterized them as "account
summaries."  Moongthaveephongsa Aff. ¶ 6.[4]

SCR Financial was founded in late 2005 or early 2006 and was
in the business of marketing financial guaranty products to
customers seeking alternatives to posting letters of credit or

---

[4] Crombie testified that "the company, SCR" had three trading
accounts: one for "SCR Capital, LLC," one for "SCR Financial
Group, Inc." and one for "Dynasty International," the last of
which was SCR's largest client and account.  Crombie Del. Depo.
30:3-12.

other collateral for business operations funding. Robell Decl.,
Ex. 20 (Deposition of Robert Chmiel), 12:15-16:7. Robert Chmiel
served as the CFO of SCR Financial from its founding until March
2007, and Andrew Wielbacher worked at the firm for "essentially"
the entire time it was in existence. Chmiel Depo. 15:25-17:14;
Robell Decl., Ex. 21 (Deposition of Andrew Weilbacher), 21:17-
22:11. Crombie had no role in the operation of SCR Financial.
Chmiel Depo. 33:11-34:5; Weilbacher Depo. 21:17-25. By late 2006
and early 2007, the principals realized that the business model
for SCR Financial was not going to work out successfully and began
winding it down. Chmiel Depo. 16:22-17:23; Weilbacher Depo.
20:16-21:5. Chmiel left in March 2007 and through at least that
time, SCR Financial did no trading activities, and specifically
did not trade or invest in futures or securities. Crombie Decl.,
Ex. 77 (Chmiel Depo.) 26:16-21, 81:25.

As SCR Financial was winding down, another entity, SCR
Capital came into existence. Crombie began working for SCR
Capital in early 2007 and was given the title of Chief Investment
Officer in March 2007. Crombie Depo. 66:2-67:23. Weilbacher also
worked at SCR Capital until October 2007. Unlike SCR Financial,
SCR Capital was to be a management company over private investment
funds. Weilbacher Depo. 17:4-5, 21:14-16. It launched two funds,
an off-shore and an on-shore fund. Id. at 17:6-8. In March 2007,
Fimat provided SCR Capital with Fimat account numbers for both
funds: C230288 for the domestic fund, referred to as the "SCR
Market Neutral Fund LP," and C230299 for the off-shore fund,
referred to as the "SCR Market Neutral Fund, LTD." Robell Decl.,
Ex. 23, 36. An employee at Fimat stated that SCR Capital's

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

account was a "futures-centric account" and, because that employee was not licensed, when he was contacted by Crombie to open up the account, he directed Crombie to contact a different desk to do this. Crombie Decl., Ex. 74 (Deposition of Michael Liciardello), 15:18-24. However, Crombie repeatedly testified that SCR Capital traded securities and did not trade futures. Crombie Depo. 83:5-7, 87:7-8. See also Crombie Decl., Ex. 74 (Deposition of Douglas Patterson), 48:1-3 (Fimat manager testifying, "There was futures trading for an account traded by somebody affiliated with at [sic] SCR Capital, not in the name of SCR Capital as the account itself."); Weilbacher Depo. 60:13-14, 62:19-63:9 (recalling Crombie trading futures in 2007 and stating his recollection of Crombie's trading was that, "in addition to the activities that [Crombie was] doing with SCR," at that time, Crombie was also trading futures separately from the company).

The traders at SCR Capital used a "quantitative equity market neutral strategy" developed by Crombie to make trading decisions, as well as doing some discretionary trading. Weilbacher Depo. 26:21-28:15. During the time that SCR Capital was trading actively, Weilbacher, Crombie and several others received daily statements from Fimat, which were sent by email from their primary contact at Fimat, Steve McNamee. Weilbacher Depo. 40:9-42:22. Crombie testified that he "was intimately aware of the daily performance on a gross basis." Crombie Depo. 168:7-16 (addressing the performance of JDC Ventures during the time period covered by the Yulish & Associates review, discussed below).

SCR Capital's on-shore and off-shore funds suffered significant losses in July and August of 2007. Weilbacher Depo.

17:20-23.  SCR Capital decided to liquidate both funds at that time and returned investments to its investors in August.  Id. at 18:2-6.  SCR Capital stopped trading and did not operate again. Crombie Depo. 68:4-6.

The Fimat documents that Crombie provided to the NFA contained monthly information for "summary periods" from November 2006 to December 2008 for two funds identified as an "Onshore Fund: SCR Market Neutral Fund, LP / FIMAT Acct. # C-230288" and an "Offshore Fund: SCR Market Neutral (Cayman) Fund, Ltd. / FIMAT Acct. # C-230299."  Robell Decl., Ex. 14, 39-64.  The summaries showed that the net liquidating value of the off-shore account grew from about $7 million in November 2006 to about $24 million in December 2008.  Id.

After the NFA received the Fimat statements, it asked Newedge USA, LLC, the corporate successor to Fimat, to provide NFA with the monthly account statements for the same accounts covered by the statements provided by Crombie.  Moongthaveephongsa Aff. ¶ 8; Robell Decl., Ex. 15 (Dep. of Steven Jones), 15:10-16.  Unlike the summaries provided by Crombie, the statements provided by Newedge for the same time period showed a total value of about eighty dollars in the account from September 2007 through February 2008, when the accounts were closed.  See Robell Decl., Ex. 12, 15-21 (showing balance for account number C230288 between $39.90 and $40.16 from September 2007 to February 2008); Robell Decl., Ex. 13, 32-37 (showing balance for account number C230299 between $40 and $40.16 for the same time period); Jones Depo. 19:24-20:14, 25:7-9 (testifying that SCR Capital was a customer of Fimat from spring 2007 "effectively" through September 2007, after which it

was inactive for several months before it was closed and that he had not heard of SCR Financial).

The USCFTC contends that the Fimat documents that Crombie provided to the NFA were formatted differently than authentic Fimat statements and that the latter contained certain items such as legal disclosures and a tax identification number, which the documents provided by Crombie did not.  The formatting differences between the formal monthly statements and the documents provided by Crombie are immaterial.  Crombie maintains that the documents that he provided to the NFA were summaries and not a standard monthly statement, and the general formatting of the documents he gave to the NFA is similar to that of summaries that a Fimat employee, Douglas Patterson, created for the SCR funds in response to a request from Crombie.  Patterson Depo. 13:16-25, 15:4-7; compare Robell Decl., Ex. 14 (summaries given by Crombie to the NFA) with Robell Decl., 18 (summaries prepared by Patterson for the SCR funds).

However, the summaries provided by Crombie to the NFA do differ materially from the summaries that Patterson prepared for the accounts during the same time period.  For example, Crombie provided the NFA with a summary for the time period from August 1-30, 2007, a time period for which Patterson created a summary for the same accounts.  Compare Robell Decl., Ex. 14, 48 with Robell Decl., Ex. 18, 48.  In that month, the two summary documents have different numbers for the same categories.  Further, the document Crombie provided has no information for the domestic account, while the Patterson document does.

United States District Court
For the Northern District of California

In his briefs, Crombie does not cite any evidence to establish that Fimat actually sent him the summaries that he gave to the NFA, and did not attest to this in his declaration.[5] Apparently to explain why he has no evidence that the summaries came from Fimat, Crombie stated in his affidavit that, in March and April 2012, Newedge's general counsel, Gary Prish, told him by email that "the ftp website Fimat had maintained for all SCR customer and related accounts," which Crombie contends was the means by which Fimat would give him these statements, "were not maintained or archived by Newedge," and "that the SCR accounts related reports and other customer files are permanently destroyed." Crombie Aff. ¶ 28. Crombie has submitted emails from Prish that were sent in March and April 2012 in which Prish stated that the SCR ftp site "no longer exists," but nothing in which he stated that any reports or customer files were permanently destroyed. Crombie Decl., Ex. 75. In his reply, Crombie appears to suggest that Fimat employees said that the ftp site was used as its archive of customer documents and that if the ftp site is no longer there, Fimat has necessarily destroyed customer files. However, the depositions of the Fimat employees that he cited about the ftp site do not state any such thing, and instead say that the reports were put on the ftp site as a means to give them to the customers. See Patterson Depo., 12:8-9 (we "put those off to an FTP for clients to grab"), 13:4-5 (they were "put up online and people could go and grab them"); 40:19-41:4 (explaining that

---

[5] Crombie alleged in his answer that "Fimat Preferred had generated the statements for Crombie." Answer ¶ 24.

there were "two methods that a client would use to access information from Fimat at that point . . . Either they would come in through a website, generic for all customers with a login and password, and be able to obtain the standard monthly statements. For certain clients [such as SCR], we created an FTP protocol site where we would put specific information up to that site so they could retrieve them.") (errors in original).  Although Crombie argues--without evidence--that Fimat provided him with the summaries and suggests that the summaries referred to SCR accounts other than the ones in the statements later produced by Fimat, Crombie also does not submit evidence that the Fimat summaries contained accurate information.

> B.  Access statements, Trading Advisory Agreement and Crombie's business with Richard Breck

Crombie provided the NFA with "monthly account statements/summaries which on their face appear to be from Access Securities, LLC ('Access'), an introducing broker NFA member, for an account Crombie managed in the name of FTGC LLC, for the benefit of Richard Breck."  Moongthaveephongsa Aff. ¶ 6; see also 1AC ¶ 26; Answer ¶ 26 (acknowledging that he provided the statements to the NFA).  Crombie also provided the NFA with a Trading Advisory Agreement (TAA) dated December 13, 2007 and purportedly signed by Breck.  1AC ¶ 28; Answer ¶ 28; see also Moongthaveephongsa Aff. ¶ 6.

Breck is the president of Source Trading, a division of Access.  Robell Decl., Ex. 26 (Deposition of Richard Breck in his personal capacity and as Rule 30(b)(6) representative of Access), 11:9-21.  In depositions for the Delaware litigation, he testified

United States District Court
For the Northern District of California

that Crombie never worked for Access or Source Trading but that, for several months in about 2007, Crombie provided some consulting services regarding the trading of index options to Breck on behalf of Source Trading and Access.  Crombie Decl., Ex. 86 (Breck Del. Depo.), 11:9-16:5; see also Breck Depo. 31:7-37:18 (stating that Crombie provided trading ideas for index options).  Crombie made recommendations to Breck, who made the transactions himself with Access's own funds.  Breck Del. Depo. at 11:21-13:16.  Access paid Crombie a total of $35,000 in consulting fees for his services; $25,000 was paid in 2007 and the balance was paid by check on January 8, 2008.  Id. at 19:5-21:23; see also Crombie Decl., Ex. 87 (2007 1099-MISC form issued to Crombie from Access showing $25,000 in nonemployee compensation); Crombie Decl., Ex. 88 (2008 1099-MISC form issued to Crombie from Access showing $10,000 in nonemployee compensation); Breck Depo. 31:7-37:18 (testifying that 1099-MISC forms reflected the entirety of the payments by Access to Crombie).  This reflected a consulting fee and not a commission because Crombie was not a registered broker with Access.  Breck Del. Depo. 20:20-24.  After Breck stopped trading using Crombie in 2007, they did not speak for years.  Id. at 18:12-23.

The TAA is dated December 13, 2007 and is purportedly signed by Breck as "Client" and Crombie as "Manager."  Robell Decl., Ex. 24, 85.  It provides,

> Client hereby appoints the Manager, and the Manager hereby accepts such appointment, to render trading advisory services for the management of the Client's sub-account for Manager (the "Account") at an [sic] nationally recognized futures commission merchant ("FCM") in the amount of US $3,000,000.00 ("Account Size").  The Account will initially be funded with US $3,000,000.00 in cash margin balances.

13

Id. at 81.  Breck testified that he first became aware of the purported TAA document in March 2011, that the signature that appeared on the document was not his and that he did not authorize anyone to sign it on his behalf.  Breck Depo. 59:3-20, 60:4-6, 61:22-62:20.  He also testified that neither he nor Access funded an account with three million dollars to be managed by Crombie. Id. at 64:3-16.

Crombie testified that, when Paron commissioned Rothstein, Kass & Company, LLP (Rothstein Kass) in 2010 to do a report on Paron's track record, he remembered entering into the TAA in 2007, but he did not have a copy of the TAA to provide to Rothstein Kass.  Crombie Depo. 103:1-17.  As a result, he directed Connie Lau of Rothstein Kass to contact Source Trading for a copy and stated that he was later told by Rothstein Kass that it received that item from Source Trading.  Id.  Crombie, however, provides no non-hearsay evidence that Source Trading or Access had the TAA or provided it to Rothstein Kass.  With its exhibits, the USCFTC has submitted a copy of a purported facsimile, dated October 24, 2010, of the TAA with a cover sheet that bears Breck's letterhead and fax number and is addressed to Lau in handwriting that Breck testified looked to him like Crombie's handwriting, although he stated that he could not be sure that it was Crombie's.  See Breck Depo. 58:18-61:15; Ex. 24, 80-85.

The disputed statements purport to have been issued by Access, located at 30 Buxton Farm Road #300 in Stamford, Connecticut, to "FTGC LLC FBO RICHARD BRECK," located at #120 at the same address.  Crombie Decl., Ex. 67.  They are dated between January 31, 2009 and August 31, 2010.  Id. at 21-59.  They appear

United States District Court
For the Northern District of California

to show an account worth about three million dollars in January 2009 and about three and a half million dollars in August 2010. Id.  The statements seem to show futures trading transactions.

In deposition testimony for the Delaware action, Breck testified that, in the spring of 2010, Crombie urgently need money and that he loaned him $200,000 initially and some additional amount thereafter.  Breck Del. Depo. 42:2-14, 44:23-24.  Breck wired Crombie the money, drew up a promissory note and sent it to him in April 2010, although Crombie did not sign the note until nine or ten months later.  Id. at 43:5-20; see also Breck Depo. 69:21-70:12.  The note stated in part,

> For value received, the undersigned, James D. Crombie (the "Borrower") agrees to pay to the order of Richard F. Breck, Jr. (the "Lender") at Ridgefield, CT (or at such other place as the Lender may designate in writing) the sum of Two Hundred Thousand and no/100 Dollars ($200,000.00) with interest from April 1, 2010 at the rate of 5% per annum.
>
> . . .
>
> The loan entitles Richard F. Breck to a 10% interest in JDC Ventures or any other money management venture going forward.  The 10% interest will have veto power over the hiring or adding of any new partners going forward in perpetuity.

Robell Decl., Ex. 45.  At the Delaware deposition, when asked if this was "meant to be a loan" or "meant to be an investment at that time," Breck responded, "[I]t was sort of both.  It was as a loan with the caveat that if his business ended up being successful, that I would own warrants or an option on a tenth, I believe, of the business, 10 percent.  But, in fact, this was a loan."  Breck Del. Depo. 43:21-44:4.  At his more recent deposition in the instant action, when asked if he intended "this $200,000 payment to be a loan or an investment," Breck responded,

"I think I described it properly.  It was a loan.  That short paragraph indicates what my intent was; that if he was successful, I would be remunerated for making a speculative loan, if you will."  Breck Depo. 78:23-79:5; see also id. at 14:12-20 ("it was a loan and it was a loan sort of--almost with a warrant, if you will, that if his--if he was successful in raising money and building a money management firm around his trading program, that I would own a percentage of that.").

Crombie testified that the April 2010 agreement was "a personal guarantee on [Breck's] fee advance."  Crombie Decl., Ex. 10 (Crombie Del. Depo. 121:9-13.  He explained that Breck advanced him fees and that it was memorialized as Crombie's personal responsibility if he "didn't earn profits back and if fees weren't covering it."  Id.  Crombie stated that it was later "memorialized . . . as a loan in the fall of 2010."  Id. at 120:21-25.  See also id. at 125:3-13 ("He wanted it collateralized as a loan. . . . I signed it as a personal guarantee on $200,000 and a fee advance from him."); but see Crombie Del. Depo. 147:22-148:6 (acknowledging that the document memorializing "Breck's loan to you in the amount of $200,000" was dated April 1, 2010 and signed by Crombie).  In his interrogatory responses in the instant action, Crombie described this as a "$200,000 fee advance loan from Richard Breck to James Crombie in 2010."  Crombie Decl., Ex. 120, 4.

Breck set up FTGC LLC as part of the 2010 loan to Crombie, as a "sort of indirect ownership structure" over any money management firm built around Crombie's trading program.  Id. at 14:12-23.  It did not exist before that time.  Id.

United States District Court
For the Northern District of California

Breck, testifying both individually and on behalf of Access, attested that a number of factors show that the Access account statements were fraudulent.  First, FTGC was established in 2010 and did not exist in 2009, when many of the statements are dated. Breck Del. Depo. 37:8-16; Breck Depo. 53:5-22.  As noted above, Breck stated that he never funded an account with three million dollars.  He also testified that he did not know about this account, stating that if it did exist with "three million bucks in it, I probably would have known about it.  Because supposedly it's mine."  Breck Depo. 53:5-25; see also Breck Del. Depo. 37:23-38:2. Further, the statements showed various currency balances and Access did not trade currencies or have the ability to do so. Breck Del. Depo. 37:20-23; Breck Depo. 53:5-17.  The account number on the statements is not an Access account number and is not formatted in the way that Access formats its account numbers. Breck Del. Depo. 35:21-36:23; Breck Depo. 54:10-55:14.  The statement did not have legal disclaimers that normally appear on Access's statements, or the information for its clearing firm. Breck Del. Depo. 39:3-16.  The suite number that appears for Breck's office, number 120, is incorrect; although Breck previously was in that suite, he moved from it at some point in 2008.  Breck Depo. 55:15-21.  Breck also attested that the statements appeared fake because they seemed to show futures trading, which his firm did not do.

One of Breck's employees, Matthew Weber, testified that, while he worked at Access between June 2009 and March 2011, he did do trading on an equity trading account owned by FTGC that Breck had control over, that Breck also executed trades in that program

17

United States District Court
For the Northern District of California

and that he was unaware of trading being done for FTGC that was distinct from this.  Weber Depo. 6:9-13:14, 36:4-7.  He also said that, during the time of his employment, he utilized software authored by Crombie, and was also monitoring and executing trades based on the "James Crombie model" or "Paron model" that "was all Futures," but that this futures trading was not done on behalf of Access, FTGC or Breck, and that he had never seen an account statement for FTGC or sent one to Crombie.  Id. at 7:14-12:18, 33:4-15.  He also testified that he was not aware of any three million dollar futures account that Breck had at Access and that he did not have any knowledge of Crombie trading futures on behalf of FTGC or Breck.  Id. at 35:19-36:7.

Breck attested that he questioned his employees and that no one at Access sent the statements to Crombie.  Breck Depo. 56:5-58:17.  Crombie testified that he was sent the statements by Access, although he did not know by whom specifically and that Access must have lied when it denied this.  Crombie Depo. 267:17-268:19.  Although Crombie avers that someone at Access sent him the statements, he does not argue or assert that the statements contain accurate information.

Breck testified that he considered the 2010 loan to be defaulted as of the time that he learned of the fraudulent brokerage account.  Breck Depo. 78:4-13.  In his interrogatory responses, Crombie described the loan as "disposed of and not owing due to fees earned earlier and later in arrears on same balance."  Crombie Decl., Ex. 120, 4.

Crombie also asserts that Breck had served as a professional reference for him and that Breck told people that he had invested

in Paron and had done so for many years. Crombie cites several pieces of evidence in support of this; however, most of it is inadmissible. First, at the Delaware trial, McConnon testified that he spoke with Breck as one of Crombie's references in May 2010. Crombie Decl., Ex. 27, 116:20-24; see also Crombie Decl., Ex. 82 (email from McConnon on March 28, 2011 stating that, as part of his due diligence process, he had relied on a "reference from Richard Breck at Access"). However, there is no admissible evidence as to what Breck said to McConnon or anyone else; the remaining evidence cited by Crombie is inadmissible hearsay. See Crombie Del. Depo. 91:11-19 (Crombie testifying that McConnon and Lyons spoke to Breck in the spring of 2010); Crombie Decl., Ex. 84 (document that Crombie states contains notes made by Michale Glennan of Tudor Investment Corp., purportedly from a conversation between Glennan and Breck, in which Breck said that Crombie had offered Breck the "opportunity to invest" and that Breck gave Crombie "$200-250K for management and is now a small stakeholder in the business"); Crombie Decl., Ex. 85 (unsworn email from Philip Kent Cooke, Director of Barclays Wealth, stating that he had met with Breck and Crombie in December 2010 and that Breck had said "that he had been an investor in Paron with Jim for many years" and "that he owned 9.2% of the Paron entity").

C. Purported misstatements made by Crombie to the NFA

The USCFTC accuses Crombie of having made a number of misstatements to the NFA during the course of the NFA's investigation about payments to or from Paron, loans and litigation involving Paron and its principals.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1.   Loans and payments to and from Paron

Two NFA representatives, Moongthaveephongsa and Sharon Pendleton, have submitted declarations stating that, on March 29, 2011, after the NFA completed its onsite examination of Paron, they participated in a phone conference call with Crombie.  Robell Decl., Ex. 31 (Pendleton Decl.) ¶ 6; Moongthaveephongsa Decl. ¶ 9. Crombie stated in his affidavit that the "NFA audit terminated on March 29, 2011" and referred to this call as the "post-audit call" but also stated that he "was told at the end of the March 29, 2011 phone call with NFA agents that the Paron audit was completed and that NFA would issue an enforcement action against Paron and against me as a result of adverse findings."  See Crombie Aff. ¶¶ 20, 22 (emphasis added).

In his affidavit, Crombie stated that, other than certain questions related to Paul Porteous, Weston Capital and his home mortgage, NFA agents did not ask him other verbal questions regarding loans "during the NFA audit."  Crombie Aff. ¶ 11. Nonetheless, he does not seem to dispute that NFA agents asked him about payments made to or from him or JDC.  He also does not seem to dispute that he was asked about loans during the March 29 phone call: he stated in his affidavit that "NFA agents did not ask me any verbal questions about purported loans or loans agreements between JDC or me" with "anyone else during the NFA onsite audit or at any other point prior to a March 29, 2011 phone call I received from NFA agents."  Id. at ¶ 14.

Both Moongthaveephongsa and Pendleton attested that, during the March 29, 2011 conference call, Pendleton "asked Mr. Crombie whether he, individually or through JDC Ventures, had any loans

outstanding" and "whether Paron had any loans outstanding."
Pendleton Decl. ¶ 8; Moongthaveephongsa Decl. ¶ 11.  Both also
stated that, in response, Crombie "identified only a loan from his
brother-in-law" and that he "did not identify any other loans."
Pendleton Decl. ¶ 9; Moongthaveephongsa Decl. ¶ 12.

The USCFTC accuses Crombie of failing to disclose that
certain payments about which the NFA asked him during the
interviews were loans or that he had outstanding loans at the time
of the March 29, 2011 phone call.

a. Transactions involving Paul Porteous

During the onsite audit, the NFA asked Crombie "about
transactions involving . . . Paul Porteous," and Crombie "replied
. . . that the transaction with Mr. Porteous involved an
investment in JDC Ventures, LLC."  Robell Decl., Ex. 32
(Moongthaveephongsa Decl.) ¶ 9.  In his answer, Crombie admitted,
"In response to NFA's questions concerning a $200,000 payment from
JDC to Porteous on May 6, 2009, Crombie informed NFA that Porteous
had previously contributed capital to JDC in 2008, and that the
$200,000 payment to Porteous was in repayment of Porteous' capital
contribution."  1AC ¶ 32; Answer ¶ 32; see also Robell Decl., Ex.
34 (March 23, 2011 email from Crombie to NFA explaining the nature
of transactions between Porteous and JDC as follows: "Porteous
contributed invested capital amounts into JDC in 2008 which were
not for an investment account, but was an investment in JDC for a
share of profits in the management company. . . . Under the
structure of his investment he had the option to put it for cash
consideration, and did so in May 2009.  Thus, $200,000 he had

invested as a silent non-operating fee share investor at the
management company was repaid to Mr. Porteous on" May 6, 2009).

In his affidavit, Crombie stated that NFA agents asked him
"who Porteous was because they had identified $367,000 in payments
from JDC to him between May 2009 and May 2010." Crombie Aff. ¶ 6.
He stated that he told them that "they were payments owing to
Porteous from a prior business investment that was collateralized
by a promissory note executed by me." Id.  He also stated that
"NFA agents asked if I owed Porteous money and I stated no, and
referenced them to page one of the Paron Op. Agmt." Id.
During his deposition, Crombie testified that Porteous had done "a
private loan with me in the early fall 2008" for $1.15 million.
Crombie Depo. 94:19-95:10.  Crombie further testified, "It was a
personal loan . . . and I technically used all of it for personal
expenses.  Some of it went to my business and some of it went to
my personal. . . . It was not a business loan.  It was a personal
loan." Id. at 101:8-17.

In his answer, Crombie further admitted, "The $200,000
payment from JDC to Porteous was a partial payment of a promissory
note, dated September 24, 2008, which Crombie had issued to
Porteous and which later became the subject of Porteous' lawsuit
against Crombie and JDC." 1AC ¶ 33; Answer ¶ 33.  In his
interrogatory responses, Crombie described this loan as a "$1.15
million loan from Paul Porteous to James Crombie in September
2008, which was partially repaid in full with interest and fees in
2010." Crombie Decl., Ex. 120, 4.

United States District Court
For the Northern District of California

b. Transactions involving Steven Lamar

During the NFA investigation, NFA asked Crombie to explain deposits into a JDC bank account of $50,000 and $250,000 on May 4 and 5, 2009 respectively.  1AC ¶ 34;[6] Answer ¶ 34; see also Robell Decl., Ex. 63 (email from the NFA to Crombie on March 23, 2011 asking about a May 4, 2009 counter credit and a May 5, 2009 payment from Jennifer Lamar).  In response, Crombie told the NFA that these deposits were payments from Steven Lamar to JDC for "financial engineering services" that Crombie and JDC provided to a hedge fund Lamar was setting up.  1AC ¶ 34; Answer ¶ 34; see also Moongthaveephongsa Aff. ¶ 15; Robell Decl., Ex. 63 (email from Crombie to the NFA, explaining the May 4 and 5, 2009 deposits as follows:  "Jennifer Lamar and Steven Lamar had started 39 Main Street Capital, LLC, a new hedge fund in 2009 and the investment manager for this was MAX Trading, LLC.  MAX Trading LLC and JDC entered an arrangement where JDC would provide financial engineering services (building models, execution systems) as a consultant to the Lamars as they started their business.  In lieu of an ownership in the SEC securities funds to be managed by 238 Main Street Capital, LLC, JDC took one time payment consideration of $300K.  The $250K payment came on 5/5 in the form of a wire transfer.  The prior day, 5/4, a payment via counter credit was made from MAX Trading LLC to JDC to total $300,000.").  In his affidavit, Crombie stated that he "informed NFA agents" that "JDC

_____

[6] The 1AC refers to May 4 and 5, 2010 instead of 2009; Crombie answered, admitting to the contents of the paragraph in its entirety.  However, the supporting emails refer to May 4 and 5, 2009.  Most other references to these transactions state 2009, so the reference to 2010 was likely a typographical error.

and I provided professional services including software I developed for 39MS [a hedge fund company owned by Steven Lamar], that salaried trading and CFO staff and office space to 39MS" and "that Lamar made a May 2009 investment into JDC and that JDC had provided these specific services and resources to 39MS in 2009." Crombie Aff. ¶ 12.

In his opposition, Crombie states that "Lamar did not loan any money to me; he made a $300,000 investment into JDC." Opp. at 18. Crombie cites a signed agreement between himself and Lamar that stated that, in exchange for a $300,000 investment by Lamar, Lamar would receive between ten percent and twenty percent of the net profits of JDC Ventures. Crombie Decl., Ex. 8. It further provided,

> Of the US$300,000 investment in JDC Ventures, LLC by Lamar, $250,000 will immediately be used to defease a liability, and $50,000 will be initially retained for working capital. This $50,000 in working capital will be returned to Lamar with no interest within four months. If unpaid after four months, it will be made whole out of first fees received on month five or beyond.

Id. (errors in original).

Crombie has repeatedly admitted that the $50,000 portion of the money received from Lamar was a "working capital loan." See Robell Decl., Ex. 11, CFTC-0000448.0005 (Crombie May 4, 2011 email); Robell Decl., Ex. 51 (Crombie April 5, 2011 email stating that "$50K of his $300K investment was structured as a working capital loan to be paid out of fees"); Crombie Aff. ¶ 13 (admitting that the "May 2009 agreement stipulated that $50,000 of the $300,000 investment Lamar made into JDC would be a working capital loan"). For example, in his sworn interrogatory

United States District Court
For the Northern District of California

responses, Crombie described the money from Lamar as a "$50,000 working capital loan from Steven Lamar to JDC Ventures, LLC in May 2010 which was not repaid and was in default following the business insolvency of JDC in 2010." Crombie Decl., Ex. 120, 4.

c. Transactions involving Weston Capital Management

In an email exchange dated March 23, 2011, the NFA asked Crombie about three payments from Weston Capital Management to JDC between February and April 2009 totaling $200,000. See Crombie Decl., Ex. 101, 2. After seeking clarification about the dates of the transactions for which the NFA sought information, Crombie responded by email,

> JDC contracted a relationship with Weston Capital Management. Weston Capital owns and manages funds under the Wimbledon label . . . In the relationship Weston owns the funds, and the investment advisor is hired as a consultant to the fund for compensation. . . . These were for professional fees paid to JDC from Weston Capital Management totaling $200,000 for the first calendar quarter of 2009.

Id. at 1.

In his affidavit, Crombie also stated that

> during the onsite audit, NFA agents asked me about $200,000 in fee advance payments to JDC from Weston Capital ("Weston") in 2009. I told NFA agents these were working capital advances. NFA agents asked me if I still had a relationship with or open working capital balances owing to Weston and I said no; and added that the Weston relationship ended with the November 2009 insolvency of a Weston hedge fund which invested in JDC and that the working capital advances were not owed by me or JDC to Weston. The working capital advances were extinguished by the insolvency of the Weston fund in 2009, and this was confirmed to me by Jeffrey Hallac who was an officer of Weston and also a member of the Board of Directors of the insolvent Weston fund. NFA agents did not query me further about Weston, the Weston fund or any money balances owing from or to Weston by JDC or me.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Crombie Aff. ¶ 9; see also Crombie Decl., Ex. 20, viii (identifying Jeffrey Hallac as a director of the Wimbledon Tactical Futures Trading Fund Offshore SPC and a Senior Managing Director of Weston); Crombie Del. Depo. 147:1-10 (stating that he has no written documentation of the waiver and that Jeffrey and Albert Hallac "said that with the closure of their fund, the legal closing of the entity, there would be no agreement between us"). Crombie has not offered any non-hearsay evidence regarding statements made by Jeffrey or Albert Hallac. As previously noted, Crombie has stated that the onsite audit ended on March 23, 2011. In his interrogatory responses, Crombie described these payments as "$200,000 business working capital loans from Weston Capital to JDC Ventures, LLC in 2009. The capital was not repaid or collected, and was disposed and not owing of following the insolvency of Weston Capital's Wimbledon branded fund that retained JDC." Crombie Decl., Ex. 120, 4. See also Crombie Del. Depo. 128:13-129:15 (testifying that he was given a "$200,000 fee advance" that was "structured as a loan" and that they "waived the loan").

Weston's CEO, Albert Hallac, who was deposed as its Rule 30(b)(6) representative, testified that the loans made to Crombie were not a payment of professional fees by Weston or an investment of any kind in JDC. A. Hallac Depo. 9:21-22; 40:23-46:10, 48:13-19. Albert Hallac also testified that he had "no idea" if Jeffery Hallac told Crombie that the loans had been forgiven but that he did not have the authority to forgive a loan on behalf of Weston. Id. at 47:15-24. He testified that he did not tell Crombie that the loan was waived or forgiven. Id. at 47:25-48:4. As the

representative of Weston, he also testified he considered the loans outstanding today. <u>Id.</u> at 48:5-6.

### d. Paul LeCoque

Paul LeCoque testified in a deposition for the Delaware matter that he was a good friend of Crombie and that, in February or March 2010, Crombie called him and told him that he had lost a lot of money and needed "a quick loan, just to get me through, help me pay the mortgage." Robell Decl., Ex. 47 (LeCoque Delaware Depo.) 6:6-14, 8:1-17. Crombie was adamant that he would be able to pay it back very quickly, by the next month. <u>Id.</u> at 9:14-17. Crombie asked for $15,000 and LeCoque agreed. <u>Id.</u> at 8:21-24. They did not enter into a formal loan agreement. <u>Id.</u> at 8:18-20. According to LeCoque, Crombie never paid the loan back. <u>Id.</u> at 9:19-20.

In his affidavit, Crombie attested that "I did not have in March 2011, or at any other time, any loan agreements or outstanding loans owing to" LeCoque. Crombie Aff. ¶ 19 (no corresponding statement made for JDC).

Crombie testified likewise in his depositions that LeCoque had not lent him money but had paid him for services and was seeking a return of the money paid. Crombie Del. Depo. 131:11-132:1; 161:15-16; <u>see also</u> Crombie Depo. 276:10-15 (testifying that LeCoque was lying when he stated that he lent Crombie $15,000). However, in the two depositions, Crombie provided different accounts of what services he provided LeCoque and why LeCoque wanted the payment returned. Crombie testified in his Delaware deposition that, in 2009, he "referred an investor who invested a small amount of money with an investment manager in the

United States District Court
For the Northern District of California

East Bay named Paul LeCoque, and that investor redeemed at a loss three months later, and [LeCoque] wanted his finder's fee [of $15,000 given] back to him." Crombie Del. Depo. 131:11-18. In his deposition in the instant matter, Crombie stated that LeCoque had paid him $15,000 because "I had provided to him options trading formulae which he had used to hedge his portfolio and his hedge fund," and that LeCoque asked for the money back "[b]ecause he was not happy with the results. I was not happy with his use of the program, and he was not happy with the results." Crombie Depo. 278:20-279:4. Crombie also stated in his affidavit that the NFA asked him for work product samples for work performed for LeCoque, Beckham and Steele (who are discussed below), and that he told the NFA that he did not retain that. See Crombie Aff. ¶ 17 (he told NFA agents that "all software work product that he executed on for JDC customers were provided to them in original digital copies onto disk copies or onto servers via ftp downloads to the customers and were the intellectual property of the customers alone. I do not keep the items that are proprietary to customers after the work product is provided to them.").

The USCFTC has offered two email exchanges purportedly between Crombie and LeCoque to support that LeCoque had loaned Crombie $15,000. Robell Decl., Exs. 48 and 49. In the first email exchange, which allegedly took place on August 19, 2010, LeCoque sent Crombie an email stating, "My wife is getting very upset over this whole situation. I told her we'd have the money back in a few weeks and it's now been 6 months. This was her money too. It's causing some real strains between us." Robell Decl., Ex. 48. He received a response from jim@jdcventuresllc.com

that stated, "I am begging for it.  I am so sorry, but this will be amended close to immediate."  Id.  In the second exchange which allegedly took place on September 2, 2010, LeCoque asked Crombie when he expected to be paid $30,000 by Tudor and how much Crombie could pay him out of that amount right away, and received a response from jim@jdcventuresllc.com stating in part, "I put invoice into Tudor this AM for 30K, so hope they can turn that around promptly."  Robell Decl., Ex. 49.

The USCFTC, however, has not offered any testimony or declaration by Crombie or LeCoque to authenticate these emails. LeCoque was not asked about the emails in the portion of his deposition that was offered into evidence.  Crombie was asked in his depositions about one of the email exchanges and the email address.  In the deposition in the instant case, Crombie testified that he did not write the email to LeCoque in August 2010, that he was not using the jim@jdcventuresllc.com email address in the "normal course of business in August 2010" and that, if he was using the email address at all at that time, "it was by mistake." Crombie Depo. 277:6-281:3.  In the Delaware deposition, Crombie stated that he "stopped using that e-mail account in the--in the early--actually in the winter of 2010, . . . January/February, something like that.  I mean, but I literally stopped--close to stop using it."  Crombie Del. Depo. 231:22-232:25.  He also said that he accessed it in the spring of 2011 and found correspondence from several people that had been sent to him from a while earlier.  Id. at 231:22-234:2.

e. Daniel Beckham

Daniel Beckham testified in his deposition in the Delaware action that Crombie had approached him about financial problems he was having in the summer of 2010 and that he had agreed to loan Crombie money to support himself and his family. Robell Decl., Ex. 46 (Beckham Del. Depo.) 7:2-10:15; see also id. at 6:6-17 (explaining that he met Crombie through their children who went to school together). He stated that Crombie "said that he needed $200,000" and that he wired Crombie $150,000 on August 24, 2010. Id. at 9:18-25. Beckham said that he transferred another $50,000 to Crombie's account on February 2, 2011 which he understood would be used by Crombie for various expenses; Beckham explained that he viewed this as following through on the $200,000 that he had originally agreed to loan Crombie. Id. at 12:3-13:7. He also stated that no loan documents were drawn up. Id. at 10:16-17. Beckham testified that the money was not given to Crombie in connection with any business arrangement between the two, including any investment, payment for services, advance on work or as a performance fee for trading, and that he did not have a working relationship with Crombie, other than to loan him this money; he had never invested money with Crombie or licensed software from him. Id. at 10:18-22:11.

On March 24, 2011, Crombie responded to an email from the NFA in which it asked him to provide written agreements with "David Beckham" and "explain what the loan to David Beckham was regarding." Crombie Decl., Ex. 96. Crombie responded,

> JDC and Crombie do not have a relationship with a David Beckham. JDC and Crombie have had past business dealings with Daniel Beckham, a hedge fund manager and

United States District Court
For the Northern District of California

entrepreneur.  JDC/Crombie has no formal contract with Dan Beckham, but has had a non-futures trading business relationship with Beckham.  JDC provides consulting services for quantitative research and other computerized models for trading securities in earlier times.  For Dan Beckham JDC deployed costs to research options and baskets trading of stocks and has been repaid for those costs and also compensated for work done.  There is no formal contract between the parties for services: services were provided and then paid for or compensated.

Crombie/JDC have never had a direct futures related mandate with this party, has not traded a proprietary account or had POA over any accounts for these parties and has had no activities as a CTA or as a futures trader with these party, and has never had a futures related mandate for this party.

. . .

The business relationship between Crombie and Beckham is fully explained above.

JDC/Crombie did have expenses drawn to research an initiative together with Beckham for securities trading (not futures) and was paid for these expenses and was paid additional amounts for services.

Id. at 2, 4 (errors in original).

During his deposition in the Delaware matter, Crombie testified that he "was paid money by Mr. Beckham for development of what we've discussed and will continue to do," and that Beckham had paid him $200,000 in the fall of 2010 as "an advance on the work I did in 2009/2010, payable in 2010."  Crombie Del. Depo. 120:8-20.  Beckham, who was deposed after Crombie, stated that Crombie's testimony on this was not truthful.  Beckham Del. Depo. 17:2-18:9.  In his more recent testimony in the instant matter, Crombie testified that Daniel Beckham had transferred $150,000 dollars to him on August 24, 2010 and $50,000 on February 2, 2011, but that these were not loans and that he and JDC Ventures did not have a loan from Beckham outstanding.  Crombie Depo. 252:1-254:6. He stated that these instead were payments for business services

United States District Court
For the Northern District of California

involving financial analysis and a part of a potential future business venture.  Id.  Crombie also testified that Beckham's testimony that he loaned Crombie $200,000 was false.  Id. at 254:25-255:3.  In his affidavit, Crombie also attests that "I did not have in March 2011, or at any other time, any loan agreements or outstanding loans owing to" Beckham.  Crombie Aff. ¶ 19 (no corresponding statement made for JDC).

### f. Mark Steele and KKS Securities

In email exchanges on March 23 and 24, 2011, the NFA asked Crombie what a "$50,000 payment to Mark Gordon Steele" was for and about his relationship with Steele and his company, KKS Securities.  Robell Decl., Exs. 34, 39.  Crombie responded that he "did consulting work for Mark Steele," which included "financial modeling and analysis" and "code work," built computer models, research sheets and "client trade allocations" for KKS, and that Crombie and JDC were paid in compensation for these services.  Id. Steele testified in depositions in both the instant case and the Delaware matter that Steele and KKS each lent Crombie $50,000. Robell Decl., Ex. 40 (Steele Depo.), 51:1-17; Robell Decl., Ex. 41 (Steele Del. Depo.), 6:9-9:1.  In the Delaware deposition, he explained that he and Crombie had "been friends for a long time" and that Crombie had asked to borrow $250,000 for seven days "because he had some cash flow shortages" as a result of clients being "slow at paying things."  Steele Del. Depo. 6:12-8:7.  He said that Crombie wrote a loan agreement for $250,000 and signed it, and that Steele told him that he did not need a written loan agreement and did not need to charge him interest for a short term loan because they were friends.  Id. at 7:17-8:7.  He testified

32

that Crombie had "never done any work" for KKS and Steele and that
it "was just a personal loan to him." Id. at 8:18-19:1.  He also
stated that Crombie never paid back KKS and paid Steele back only
$2,400.  Id. at 9:2-5.  He also testified that neither Steele nor
KKS had ever given Crombie a Form 1099.  Id. at 9:17-21.

At his deposition in the instant case, Steele gave similar
testimony.  See Steele Depo. 38:3-9, 51:1-22 (Steele and KKS lent
Crombie money because they were purportedly friends); 39:6-40:23
(to the best of his knowledge, Crombie did not do any work for
Steele or KKS and they never gave him W2s or 1099s); 57:19-58:20
(to the best of his knowledge, Crombie never provided computer
code to KKS, never referred clients or financial professionals to
KKS and did not have an arrangement with KKS for payment for any
such referrals, JDC Ventures did not do work for KKS and no
company affiliated with Crombie did work for KKS or Steele).
Steele also identified a check that he brought with him to the
deposition as the check that KKS had issued to Crombie as its loan
to him and stated that he got the copy of the check from Joe
Klein, KKS's CFO.  Steele Depo. 51:8-14; 120:11-15; see also
Robell Decl., Ex. 42.  The check had the words "personal loan"
noted on the memo line.  Id.

During both of his depositions, Crombie testified that the
money he received from Steele and KKS was in payment for doing
work for the company, including doing software development work
revamping its execution and order management systems, and that
Steele lied when he said that these were loans.  Crombie Depo.
234:24-236:1, 241:23-242:4; Crombie Del. Depo. 129:19-130:19; see
also Crombie Del. Depo. 161:15-18 (the NFA "asked about Mark

Steele, and I said correctly that I did investment services for his firm"). He also testified that Steele or his registered broker dealer affiliate, Girard Securities, Inc., provided him or his accountant with a 1099 for the payments. Crombie Depo. 236:21-25; Crombie Del. Depo. 131:8-10; Crombie Aff. ¶ 17.[7] In his affidavit, Crombie attested, "I did not have in March 2011, or at any other time, any loan agreements or outstanding loans owing to" Steele. Crombie Aff. ¶ 19. He made no corresponding statement made for JDC. He also stated that the check that he received from KKS "did not have . . . any notation as a loan on the check memo section" and that he "executed no loan agreements and signed no loan documents with Steele or his company KKS for any sum of money at any time." Crombie Aff. ¶ 18; see also Crombie Ex. 10, 129-130-131, 161 ("they asked about Mark Steele, and I said correctly that I did investment services for his firm").

    2. Purported Misstatements Regarding Litigation

    On March 14, 2011, McConnon sent the NFA a list of documents and Paron's answers to audit questions that the NFA had propounded in advance of the onsite interview. Crombie Decl., Exs. 42, 43. In response to a request for "Customer Complaint File Including any Litigations, Arbitrations, or Settlements with Customers During the Past 2 Years for APs, Principals, and PCM," Paron answered, "No formal complaints," and identified "[o]ne informal email complaint." Crombie Decl., Ex. 43, 140.

---

    [7] Crombie has not offered either of these 1099 forms into evidence and states that the "1099-MISC form Steele provided to me appears to be a forgery." Crombie Aff. ¶ 17 n.3.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

McConnon testified at his deposition in the instant matter that Crombie filled out the questionnaire, told McConnon that he was having computer problems, sent him the files, and asked him to send them to the NFA. Crombie Decl., Ex. 80 (McConnon Depo.) 126:8-128:5. In his affidavit, Crombie disputed this, stating that he had "no internet service issues" during that weekend and that, if he had, he could not have sent the files to McConnon. Crombie Aff. ¶ 29. In Crombie's declaration, he further stated that McConnon "had authored the edits of including [sic] all Paron responses to NRA questionnaire." Crombie Decl. ¶ 44.

In his recent affidavit, Crombie attested that NFA agents "did not ask me about legal matters or lawsuits during the NFA audit." Crombie Aff. ¶ 6; see also Crombie Del. Depo. 166:3-19 ("I told them the Porteous matter was discharged . . . They did not ask me directly about lawsuits, nor did I answer it."); 168:2-6 (affirming that the "NFA agent has misrepresented or perjured himself in respect to this affidavit regarding his questions" because he "didn't ask me directly about loans, and he didn't ask me directly about lawsuits"). Moongthaveephongsa attested, "During NFA's examination, Crombie represented that there were no lawsuits against him, PCM, or JDC," but did not state what questions, if any, NFA agents asked Crombie about litigation. Moongthaveephongsa Aff. ¶ 13. He also stated that, during the onsite examination of Paron, Crombie did not disclose the Porteous and Lamar lawsuits. Id. at ¶¶ 7-8.

In an email that he sent on April 5, 2011, Crombie stated in part,

> The NFA asked about current litigation from futures clients in specific.  They also mentioned the Porteous and Lamar payments from bank accounts, and asked about those disputes. . . .
>
> The NFA did ask about open lawsuits and they were aware that Porteous was a closed matter and not open litigation.  The original Operating Agreement for Paron also noted it, and they asked about it.  They also asked about the Lamar investment (and deemed this to be a loan not an investment) and I told them of the failed investment and the dispute. . . .
>
> I was asked about litigation directly and answered their questions directly as noted above.

Robell Decl., Ex. 51 (Crombie email to Rory Cohen).

In his interrogatory responses, Crombie stated that he was involved in six lawsuits between January 1, 2008 and the date of the responses, including five that were filed before the NFA investigation began in March 2011.  Robell Decl., Ex. 33, 3. According to his responses, none of those five lawsuits, including two involving Porteous and one involving Lamar, were still pending in March 2011.  Id.

II. The Paron promotional materials

Both the Flip book and the Newsletter had monthly performance tables that date back to 2006, four years before Paron was formed. Robell Decl., Exs. 5, 52.  Both relied upon Crombie's purported track record at JDC Ventures for the performance data prior to Paron's inception.  Id.; see also Robell Decl., Ex. 53 (Crombie email to the NFA explaining that the "returns record is for my program pre-Paron").  Both claimed that Crombie's annual rate of return at JDC Ventures was about 27.5 percent in 2007, about 38.6 percent in 2008 and 9.8 percent in 2009.  Robell Decl., Exs. 5, 52.

United States District Court
For the Northern District of California

In a March 19, 2011 email from Crombie to the NFA, in response to a request for information underlying the claimed performance statistics, Crombie identified SCR as "the specimen account for November 2006 – January 2009" and noted that the performance review of that time period was conducted by a third party, Yulish & Associates.  Robell Decl., Ex. 53.  At his deposition, he further stated that Omega Advisors, Inc., through Peninsula LP, was also a client account upon which the purported percentage rate of return for 2008 was based, although he continued to testify that "Yulish would be the only entity that could say what JDC Ventures' performance was on a yearly basis." Crombie Depo. 146:5-147:20.  The yearly and monthly numbers provided in the Flip book and the Newsletter for this time period correspond to the net rates of return calculated in the Yulish report.  Compare Crombie Decl., Ex. 60, with Robell Decl., Exs. 5, 52.

The Yulish report, when explaining the procedures performed, stated that the firm "obtained third party brokerage statements for the trading account to which JDC serves as investment manager to trade futures in the S&P 500 and in the Nikkei 225 indices. . . . We relied upon the information contained in these statements as an accurate representation of the investment activity and results for each period verified."  Crombie Decl., Ex. 60.  At the Delaware trial, McConnon attested that he had spoken with someone at Yulish who said the report was accurate that they "had done the third-party verifications."  Crombie Decl., Ex. 27, 63:5-16.  He also testified that the person from Yulish later admitted to him

that he had not received the statements from the broker.  Id. at

157:1-20; 208:8-20.[8]

According to Crombie, in conducting its review, Yulish

"focused on the SCR Financial statements," which were discussed

previously.  Id. at 301:9-12 (Crombie testifying, "That's all they

did, yes."); see also Crombie Del. Depo. 29:13-30:12 (Crombie's

testimony that Yulish verified "the trading account relationship

that I had with the company, SCR," with which he had three trading

accounts); 35:9-14 (testifying that he provided Yulish with the

SCR summary reports and the contact information for individuals

from whom he could obtain the full account statements).

When the NFA asked for documentation to support the

historical returns, for the period for January 2009 through August

2010, Crombie identified the Access account and referred to a

review that was conducted by the accounting firm Rothstein Kass.

Robell Decl., Ex. 53.  The monthly rates of return provided in the

Flip book and the Newsletter for this time period match the

"monthly net of hypothetical fees rate of return" calculated in

the Rothstein Kass report.  Compare Crombie Decl., Ex. 68, with

Robell Decl., Exs. 5, 52.

_____

[8] Crombie asserts that Albert Hallac from Weston testified
that the JDC performance record from SCR was also independently
confirmed to Weston in 2009, suggesting that this was separate
from the Yulish report.  Opp. at 8.  Hallac testified that, before
Weston sponsored Crombie as a manager on its fund, Weston was
"given [a] performance track record, which was verified by outside
third parties" that included "an accounting firm" but that he
could not recall "what outside parties" in particular they were.
Hallac Depo. 25:24-26:22.  This is consistent with Weston having
been provided the Yulish report and does not suggest that there
was a separate verification conducted.

United States District Court
For the Northern District of California

Crombie testified in the Delaware deposition that, in the fall of 2010, Paron decided to seek an additional review of Crombie's track record after the time period covered by the Yulish review "for marketing purposes, to not leave a gap in the investor promotion materials . . . So that marketing materials could be written."  Crombie Del. Depo. 90:12-91:1; see also id. at 91:9-12 (The review was "seeking to confirm performance for the purpose of track record.").  For the second review, Rothstein Kass analyzed the Access statements described above.  Crombie Depo. 301:5-21; see also Crombie Del. Depo. 91:4-8 ("I was asked for a specimen account, and I provided Richard Breck" and no other account, "[b]ecause Richard Breck was the only one that was contiguous through the entire period."), 103:18-103:25 (stating that he provided the Access monthly statements to Rothstein Kass). Crombie testified in the Delaware deposition that Rothstein Kass had asked him for additional information that he did not have, including the TAA, that he told Rothstein Kass to contact Access and ask for that information because "part of the scope of your engagement is to get that, confirm that," and that "they did so" and told him that they did.  Crombie Del. Depo. 102:24-103:25.

The DDQ that Paron sent to customers claimed that the total assets managed or advised by Paron in 2011 was approximately $35 million.  Robell Decl., Ex. 1.  During the course of the audit, Crombie admitted to the NFA that this amount was incorrect.  1AC ¶ 42; Answer ¶ 42; see also Crombie Aff. ¶ 8.

II. Procedural history

On September 15, 2011, the USCFTC filed this action against Defendants Paron and Crombie.

**United States District Court**
For the Northern District of California

In a separate lawsuit brought on April 14, 2011 in Delaware Chancery Court, Paron, along with McConnon and Lyon, sued Crombie for fraud.  In the suit, they alleged that Crombie forged account statements from Fimat Futures USA LLC and Access Securities, LLC and made misrepresentations about his performance record, employment history and personal financial situation, to induce McConnon and Lyons to leave their jobs and form Paron with him, providing him with access to their money and valuable client contacts.  Paron Capital Mgmt., LLC v. Crombie (Paron I), 2012 WL 2045857, at *4 (Del. Ch.).  Because Crombie purportedly continued to make and perpetuate these misrepresentations while working as the initial manager of Paron, they also asserted that he breached his fiduciary duty of loyalty to McConnon, Lyon and Paron under the incorporation agreement.  Id.

The Delaware Chancery Court held a trial in early October 2011.  Id.  Claiming financial hardship, Crombie did not appear at trial and did not present any evidence in his defense.  Id.  The Delaware Chancery Court denied his motion to dismiss the action on the grounds of forum non conveniens due to his purported financial hardship.  Paron I, 2012 WL 3206410, at *2 (Del. Ch.) (summarizing its earlier holding).

On December 21, 2011, Crombie filed a third-party complaint against McConnon and Lyons in this Court, alleging that they were responsible for the misrepresentations in the promotional material, which they had authored and distributed, and that they had made false statements to the NFA, CFTC, this Court and the Delaware Chancery Court, including the denial of their involvement in the creation of the fraudulent promotional materials.

On January 24, 2012, the Delaware Chancery Court issued a memorandum opinion, denying various post-trial motions made by Crombie. Paron I, 2012 WL 214777, at *1-8 (Del. Ch.). In the opinion, the court indicated that it considered the "matter fully submitted and ripe for a final determination on the merits." Id. at *8.

On February 10, 2012, Crombie filed a voluntary petition for bankruptcy. In re Crombie, Case No. 12-10389 (Bankr. N.D. Cal.), Docket No. 1. As a result, the Delaware action was stayed. Paron I, 2012 WL 2045857, at *4. Pursuant to a motion by McConnon and Lyons, the stay was lifted on or about February 23, 2012. Id.; In re Crombie, Docket No. 16.

On April 6, 2012, this Court granted McConnon and Lyons' motion to dismiss Crombie's third-party complaint and quashed service upon them. Docket No. 117. The Court found, among other things, that Crombie had not sufficiently plead the elements of fraud and misrepresentation under California law and that he lacked standing to pursue his claims because of his bankruptcy filing.

On May 11, 2012, the bankruptcy trustee moved for an order permitting him to abandon the claims that were the subject of Crombie's dismissed third-party complaint. In re Crombie, Docket No. 40.

On May 15, 2012, the bankruptcy court granted Crombie a discharge. In re Crombie, Docket No. 45.

On May 22, 2012, the Delaware Chancery Court issued an opinion adjudicating the merits of the Delaware action and finding Crombie liable on both claims. Paron I, 2012 WL 2045857, at *4.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

On that date, the Delaware Chancery Court also issued a judgment based on the opinion. Paron I, 2012 WL 1850728 (Del. Ch.).

On May 23, 2012, Crombie filed a motion in this case for leave to file an amended third-party complaint against McConnon and Lyons asserting claims for negligence, misrepresentation and violation of sections 9(a)(4) and 4b(a)(1)(A),(B) of the Commodity Exchange Act. Docket No. 137.

On June 6, 2013, the bankruptcy court granted the trustee's motion and confirmed the abandonment of the claims in the proposed third-party complaint. In re Crombie, Docket No. 49.

On June 25, 2012, this Court denied Crombie's motion for leave to file a third-party complaint against McConnon and Lyons, holding that the proposed complaint failed to state a claim. Docket No. 157.

On August 2, 2012, the Delaware Chancery Court denied Crombie's motion to alter the judgment entered there and to stay execution of that judgment. Paron I, 2012 WL 3206410, at *2. The court concluded there was no manifest injustice that required alteration of the judgment, noting that it had previously considered Crombie's arguments based on financial hardship and proceeding in Delaware and his contentions that McConnon and Lyons abused the discovery process. Id. The Chancery Court entered a supplemental judgment against Crombie at that time. Id. at *5.

On September 5, 2012, this Court entered a consent order resolving the USCFTC's claims against Paron in the present case, prohibiting Paron from, among other things, trading or entering into any transactions involving commodity futures and options. Docket No. 190.

On March 13, 2013, the Delaware Supreme Court affirmed the Chancery Court's judgment based on its May 22, 2012 and August 2, 2012 orders.  Paron I, 62 A.3d 1223, at *1 (Del. 2013).

On April 1, 2013, the bankruptcy trustee filed a report and certification, showing that the bankruptcy estate had been fully administered and that the claims that Crombie seeks leave to assert now were abandoned.  In re Crombie, Docket No. 75.  The following day, the bankruptcy court discharged the trustee and closed Crombie's bankruptcy case.  In re Crombie, Docket No. 76.

DISCUSSION

I.   Cross-motions for summary judgment

A. Legal standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

United States District Court
For the Northern District of California

1    Material facts which would preclude entry of summary judgment

2  are those which, under applicable substantive law, may affect the

3  outcome of the case.  The substantive law will identify which

4  facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S.

5  242, 248 (1986).

6    Where the moving party does not bear the burden of proof on

7  an issue at trial, the moving party may discharge its burden of

8  production by either of two methods:

9      The moving party may produce evidence negating an
       essential element of the nonmoving party's case, or,
10     after suitable discovery, the moving party may show that
       the nonmoving party does not have enough evidence of an
11     essential element of its claim or defense to carry its
       ultimate burden of persuasion at trial.
12
   Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d
13
   1099, 1106 (9th Cir. 2000).
14
15    If the moving party discharges its burden by showing an

16  absence of evidence to support an essential element of a claim or

17  defense, it is not required to produce evidence showing the

18  absence of a material fact on such issues, or to support its

19  motion with evidence negating the non-moving party's claim.  Id.;

20  see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990);

21  Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If

22  the moving party shows an absence of evidence to support the non-

23  moving party's case, the burden then shifts to the non-moving

24  party to produce "specific evidence, through affidavits or

25  admissible discovery material, to show that the dispute exists."

26  Bhan, 929 F.2d at 1409.

27    If the moving party discharges its burden by negating an

28  essential element of the non-moving party's claim or defense, it

44

must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u>  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

B. Discussion

In the 1AC, the USCFTC charges Crombie with three counts of violating the Commodity Exchange Act: (1) concealing material facts and making false statements or representations to the NFA in violation of § 9(a)(4) of the Act; (2) solicitation fraud in violation of § 4b(a)(1)(A) and (B) of the Act; and (3) fraud by a CTA in violation of § 4o(1)(A) and (B) of the Act.

1. Section 9(a)(4) of the Commodity Exchange Act

Section 9(a)(4) of the Act makes it illegal for

> Any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a . . . futures association designated or registered under this Act acting in furtherance of its official duties under this Act.

7 U.S.C. § 13(a)(4).

In the 1AC, the USCFTC alleges that Crombie violated § 9(a)(4) because, in March 2011, in response to the NFA investigation and audit, he willfully made false statements and misrepresentations to the NFA, including

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

(1) providing fraudulent account statements to NFA;
(2) providing a fraudulent TAA to NFA; (3) making false
statements to NFA concerning the existence of lawsuits
in which the Defendants were named parties; (4) making
false statements to NFA concerning capital contributions
to Paron; (5) making false statements to NFA concerning
large-sum payments to and from JDC; (6) making false
statements to NFA concerning the number of outstanding
loans owed by Paron; and (7) making false statements to
NFA regarding the sources of the fraudulent documents.

1AC ¶ 47.

In its motion, the USCFTC seeks summary judgment that Crombie willfully violated this section by willfully providing the fraudulent Fimat and Access statements and the fraudulent TAA to the NFA and by making false statements regarding the payments to and from Crombie and JDC Ventures, about outstanding loans and about lawsuits filed against him.  The USCFTC has not requested a finding that Crombie violated § 9(a)(4) by making false statements about the sources of the fraudulent documents.  In his cross-motion, Crombie seeks summary judgment on each of the seven purported violations listed in the 1AC.

There is no dispute of material fact that the NFA is a registered futures association under the Act or that it was acting in furtherance of its official duties when investigating Paron. First Amended Complaint (1AC) ¶¶ 15, 21; Answer ¶¶ 15, 21.  The parties disagree about whether there is a material dispute of fact regarding whether the documents were false, whether, if they were false, Crombie willfully provided them to the NFA, and whether he made false statements to it.

a. Documents provided to the NFA

i. Fimat statements

The USCFTC alleges that Crombie willfully provided the NFA with fraudulent account summaries purportedly from Fimat.  There

46

United States District Court
For the Northern District of California

1   is no dispute of material fact that the information in the Fimat

2   summaries that Crombie gave the NFA was false.  Although Crombie

3   appears to suggest that the summaries may have referred to a

4   different account that was also controlled by SCR and that was the

5   source of the discrepancies, the summaries he provided did not

6   match the financial information contained in the authentic

7   statements for the Fimat accounts with the same account number.

8   Thus, even if some other SCR account may have had other activity,

9   the accounts purportedly reflected on the summaries did not.

10       There is also no dispute of material fact about whether

11  Crombie acted willfully.  "For purposes of the Act, . . . it is

12  well settled that: 'if a person 1) intentionally does an act which

13  is prohibited,-- irrespective of evil motive or reliance on

14  erroneous advice, or 2) acts with careless disregard of statutory

15  requirements, the violation is willful.'"  Lawrence v. Commodity

16  Futures Trading Comm'n, 759 F.2d 767, 773 (9th Cir. 1985) (quoting

17  Flaxman v. Commodity Futures Trading Comm'n, 697 F.2d 782, 787

18  (7th Cir. 1983)).  To establish willfulness, the USCFTC need only

19  show that Crombie's actions were "intentional as opposed to

20  accidental."  Id.  "Proof of an evil motive is unnecessary."  Id.

21  (citing Hinkle Northwest, Inc. v. SEC, 641 F.2d 1304, 1307-08 (9th

22  Cir. 1981)).

23       The USCFTC argues that Crombie either knew that the Fimat

24  summaries contained inaccurate information about the amount of

25  money in the accounts, or "[a]t the very least" that he acted with

26  "careless disregard" of their falsity, when he gave them to the

27  NFA.  Reply at 2 & n.2.  The USCFTC has submitted evidence that

28  Crombie acknowledged that he knew of the daily performance of his

trading program and that he received daily reports from Fimat of the performance on the SCR Capital accounts, which bore the numbers of the accounts reflected on his statement.  Thus, even if Crombie did not create the summaries himself, he should have known that they did not reflect the actual performance of those accounts.

ii. Access statements and TAA

There is no dispute of material fact that the Access statements provided by Crombie to the NFA contained inaccurate information.  Breck testified that he did not have an account during the relevant years for FTGC that traded futures and that he did not sign a TAA with Crombie.  Crombie testified that he recalled signing a trading agreement with Breck, but never testified that the copy of the TAA that he gave to the NFA was an actual copy of that agreement; instead, he primarily argued that he got the copy from a third party.  The USCFTC offered evidence that the statements were fraudulent: Breck testified that the account did not exist to his awareness, that he did not trade in futures, that he had never given Crombie three million dollars with which to fund the account, and that no one at Access sent Crombie the statements.  Crombie did not introduce evidence sufficient to create a dispute of fact: although Weber testified that Breck had a trading account for FTGC and Crombie testified that he received the statements from Access, Crombie did not introduce any evidence that the statements contained accurate information, including that the account traded in futures, as the statements reflected, or that Breck had ever funded the account with three million dollars.

United States District Court
For the Northern District of California

There is also no dispute of material fact that Crombie provided the NFA with the fraudulent documents willfully. Crombie has testified that he received the copy of the TAA from Rothstein Kass, which told him that it obtained the copy of the Access statements. He also testified that Access sent him the statements. However, even if he did not create the documents himself, Crombie has cited no evidence, not even his own sworn statement, to support that the Access account actually existed or, more importantly, that he believed that it did. Thus, he has raised no dispute of material fact about whether he knew that the statements were fraudulent.

### iii. Payments to Porteous

There is no dispute that the NFA asked Crombie by email to provide a written explanation of the purpose of the $200,000 payment to Porteous or that Crombie responded that it was a repayment of a capital investment in JDC Ventures. Crombie admitted during his deposition that Porteous had actually made a personal loan to him. Accordingly, there is no dispute of material fact that Crombie willfully made a misstatement to the NFA about the loan from Porteous.

### iv. Payments from the Lamars

There is no dispute that the NFA asked Crombie by email to provide a written explanation of the payments totaling $300,000 from the Lamars, or that Crombie responded in writing that these deposits were payments from Steven Lamar to JDC for "financial engineering services" that Crombie and JDC provided for a hedge fund Lamar was setting up.

**United States District Court**
For the Northern District of California

1    There is also no dispute of fact that $50,000 of this money

2    was in fact a loan from the Lamars to Crombie.  Although Crombie

3    asserts in his opposition that "Lamar did not loan any money to

4    me: he made a $300,000 investment into JDC," Opp. at 18, Crombie

5    has repeatedly admitted, including in his interrogatory responses,

6    that $50,000 was a "working capital loan."  The agreement between

7    Steven Lamar and Crombie is not to the contrary; it specifically

8    provides that Crombie will use $50,000 as working capital and will

9    repay the amount in some fashion.  Thus, there is no dispute that

10   Crombie misrepresented the nature of the payments from the Lamars

11   when he told the NFA that they were for "financial engineering

12   services."

13   Further, Crombie admitted in his interrogatory responses that

14   this loan "was not repaid and was in default following the

15   business insolvency of JDC in 2010."  There is no material dispute

16   that the NFA agents asked Crombie during the March 29, 2011

17   conference call what outstanding loans he, JDC or Paron had, and

18   that he disclosed only a loan from a family member.  Although

19   Crombie states in his opposition that "NFA put no verbal questions

20   . . . to me about loans to JDC or me . . . during the NFA audit,"

21   in the evidence that he cites, his affidavit, he distinguishes the

22   "NFA audit" from "the post-audit phone call" and states only that

23   he was not asked these questions during the audit "or at any point

24   prior to a March 29, 2011 phone call I received from NFA agents."

25   See Opp. at 15; Crombie Aff. ¶¶ 11, 14.  Accordingly, there is no

26   dispute of material fact that Crombie made a false representation

27   when he told the NFA that the only outstanding loan that he had at

28   the time of the phone call was the one from his family member.

United States District Court
For the Northern District of California

v.  Payments from Weston Capital

There is no dispute that the NFA asked Crombie by email on March 23, 2011 about the payments totaling $200,000 from Weston Capital Management to JDC or that he responded on that day that these payments were for "professional fees."  However, he also attests in his affidavit that he provided a verbal explanation to the agents sometime during the onsite audit that took place between March 21 and 23, 2011 that these were "working capital advances" and that he did not have a balance owed to Weston because of the insolvency of the Weston fund he had been hired to manage in 2009.

Crombie later admitted in his interrogatory responses that these payments amounted to a "business working capital loan." This is obviously inconsistent with the written representation that the payments were "professional fees."  However, there is a dispute of fact as to whether Crombie was being willfully untruthful because he has attested that he provided a roughly contemporaneous verbal explanation to the NFA agents during the onsite audit that these were "working capital advances."  Thus, there is a dispute as to whether he was being recklessly or intentionally false when he wrote that the payments were "professional fees."

Although Crombie has not introduced any non-hearsay evidence that Weston in fact forgave the loan, there is also a dispute of material fact as to whether Crombie reasonably believed that the debt was forgiven and thus that it was no longer outstanding at the time of the audit and did not need to be disclosed when the NFA agents asked him to provide details of all outstanding loans.

Although the younger Hallac may not have had the authority to say the loan was forgiven, if he did say that it was forgiven, as Crombie has attested, there is a material dispute regarding whether Crombie could have reasonably believed that it was.

### vi. Payments from LeCoque, Beckham and Steele

There is also a material dispute of fact as to whether Crombie made misstatements to the NFA regarding the nature of the payments from LeCoque, Beckham and Steele when he told the NFA that these were payments for services provided and did not disclose that these were personal loans. In each instance, Crombie has testified that he provided them or their companies with services and that their payments were not loans. He also stated in his affidavit that he never had any loans outstanding to these individuals. LeCoque, Beckham and Steele have testified that these were loans and that he did not provide them with services in return for payment, which supports that Crombie lied about the nature of these transactions. Although the government argues that Crombie has not offered evidence to support his claims and has just "concoct[ed] unsupported conspiracy theories," he has offered sworn statements that are sufficient to create a dispute of material fact about the real nature of these transactions and thus whether he lied in his statements to the NFA.

### vii. Involvement in litigation

There are several disputes of material fact that preclude summary adjudication for either party on whether Crombie made fraudulent statements about whether he, Paron or JDC had been involved in litigation.

**United States District Court**
For the Northern District of California

1   First, there is a material dispute of fact as to whether it

2   was Crombie or McConnon who authored the written response to the

3   USCFTC, in answer to its request for information on all

4   litigation, arbitrations or settlements it was involved in with

5   customers during the two years prior to the audit.  McConnon

6   testified that Crombie wrote the response, and Crombie stated in

7   his declaration that McConnon did.

8   Second, Crombie has attested that the NFA did not ask him

9   about litigation during the audit and there is a material dispute

10  of fact as to what he was asked.  Although the USCFTC contends

11  that Crombie's assertion is contradicted in its entirety by the

12  contemporaneous email he wrote stating that he was asked about

13  litigation, that email appears to refer to questions from the NFA

14  about ongoing litigation.  At the time of the NFA audit, there was

15  no ongoing litigation involving Crombie, Paron or JDC.

16                          viii.    Sources of the fraudulent documents

17  Crombie seeks a finding that he did not violate § 9(a)(4) by

18  misrepresenting the source of the fraudulent documents.  However,

19  there is a material dispute of fact on this point.

20  Crombie told the NFA that he obtained the statements from

21  Fimat and Access and that he got the copy of the TAA from

22  Rothstein Kass, which in turn obtained it from Access.  The USCFTC

23  has submitted evidence suggesting that these statements were

24  false: Access has denied that it sent the statements, Fimat has

25  provided summaries that it says were the correct ones, and there

26  is some evidence that Access never sent the TAA to Rothstein Kass

27  and that Crombie may have done so instead.

28

ix.   Summary

The Court grants the USCFTC's motion for summary judgment on its first cause of action charging Crombie with violation of § 9(a)(4) of the Commodity Exchange Act and denies Crombie's cross-motion for summary judgment.  There is no material dispute that Crombie willfully provided the NFRA with fraudulent FIMAT and Access statements and that he made false statements to the NFA about the payments to and from Porteous and the Lamars.  The disputes of fact as to the other statements do not preclude summary judgment on this cause of action.

2. Sections 4b(a)(1)(A),(B) and 4o(1)(A),(B) of the Commodity Exchange Act

In relevant part, § 4b(a)(1) of the Act makes it unlawful

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; . . .

to cheat or defraud or attempt to cheat or defraud the other person; [or]

willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record . . .

7 U.S.C. § 6b(a)(1).

"The elements of a fraud action under section 4b of the CEA are 'derived from the common law action for fraud.'"  Commodity Futures Trading Comm'n v. King, 2007 WL 1321762, at *2 (N.D. Tex.) (quoting Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1018 (5th Cir. 1990)).  Thus, to establish a violation, "CFTC had the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive

United States District Court
For the Northern District of California

omission; (2) scienter; and (3) materiality." <u>Commodity Futures</u>
<u>Trading Comm'n v. R.J. Fitzgerald & Co.</u>, 310 F.3d 1321, 1328 (11th
Cir. 2002).  "Unlike a cause of action for fraud under the common
law of Torts, 'reliance' on the representations is not a requisite
element in an enforcement action."  <u>Id.</u> at 1328 n.6.

   "The CFTC must additionally show that the fraud was (1) in
connection with an order to make or the making of a contract of
sale of a commodity for future delivery, and (2) made for or on
behalf of another person."  <u>United States Commodity Futures</u>
<u>Trading Comm'n v. Driver</u>, 2012 U.S. Dist. LEXIS 93038, at *13
(C.D. Cal.) (citation omitted).  "Actionable misrepresentations
include those made to customers when soliciting their funds."  <u>Id.</u>
at *14 (citing <u>Commodity Futures Trading Comm'n v. Rosenberg</u>, 85
F. Supp. 2d 424, 447-48 (D.N.J. 2000); <u>Saxe v. E.F. Hutton & Co.</u>,
789 F.2d 105, 110-11 (2d Cir. 1986)).

   Similarly, § 4o(1) of the Act makes it

   unlawful for a commodity trading advisor . . . by use of
   the mails or any means or instrumentality of interstate
   commerce, directly or indirectly---

   to employ any device, scheme, or artifice to defraud any
   client or participant or prospective client or
   participant; or

   to engage in any transaction, practice, or course of
   business which operates as a fraud or deceit upon any
   client or participant or prospective client or
   participant.

7 U.S.C. § 6o(1).  Here, there is no dispute that Paron was a
commodity trading adviser or that Crombie was one of its
principals.  <u>See</u> 1AC ¶ 14; Answer ¶ 14.  Thus, the elements of a
violation of § 4o(1) largely overlap with those of a violation of
§ 4b.

Unlike § 4b of the Act, § 4o(1)(B) does not have a scienter requirement because it "does not expressly require 'knowing' or 'willful' conduct as a prerequisite for establishing liability." Commodity Futures Trading Comm'n v. Weinberg, 287 F. Supp. 2d 1100, 1108 (C.D. Cal. 2003). Thus, to succeed on an enforcement claim for violation of this provision, the USCFTC must "prove only that the commodity trading advisor intentionally made the statements complained of, and not that the advisor acted with the intent to defraud." First Nat'l Monetary Corp. v. Weinberger, 819 F.2d 1334, 1342 (6th Cir. 1987); see also Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 285 (9th Cir. 1979) (holding that "an action for injunctive relief by the [US]CFTC under section 4O(1) requires only that the violator have acted intentionally. That is, he must have intended to employ the 'device, scheme, or artifice' but it is not necessary that he know that its result will be to defraud the client or prospective client.").

### a. Misrepresentations and omissions to prospective customers

The USCFTC contends that, even if Crombie did not author the promotional material himself--as he contends--he provided the false information about his performance history that was used in the promotional material, including by giving the Fimat and Access statements to Yulish and Rothstein Kass for their review. He has offered no evidence that he did not do this. As previously discussed, he has also raised no dispute of fact that the information in the statements themselves was false or thus that the reports based on these statements were as well. Further, Crombie has admitted that the DDQ contained false information

about the amount of assets managed or advised by Paron.  1AC ¶ 22;

Answer ¶ 22; see also Crombie Aff. ¶ 8 ("Following the onsite call

I made admissions to NFA agents the managed account AUMs were

materially less than $10 million").

    There is no dispute that Paron did use these materials to

solicit potential clients.  See 1AC ¶ 22; Answer ¶ 22 (admitting

that, between August 2010 and March 2011, "Defendants used the

Flip Book, the Newsletter, and the DDQ as promotional materials

for the solicitation of potential clients for Paron").  Crombie

himself has testified that he participated in meetings in which

potential clients were solicited and were given these materials.

Crombie Depo. 183:23-184:16, 194:13-196:2.  Although Crombie

states in his opposition that his "communications with investors

on calls or at meeting[s] was [sic] limited to demonstrating

software systems I had authored or was expert in," Opp. 3, the

cited deposition transcript does not support his assertion.

Instead, at the deposition, he testified that he did not discuss

JDC Venture's past performance but that, at these meetings, Paron

did give potential customers the Flip book, DDQ and other

materials which had the performance information for JDC Ventures.

Crombie Depo. 183:23-184:16, 194:13-196:2.  Thus, there is no

dispute of material fact that Crombie directly participated in the

solicitation of clients using these materials.

                    b. Scienter

    As discussed above, scienter is an element of a § 4b claim.

Thus, to prove that claim, the USCFTC must show that Crombie

"intentionally violated the Act or acted with 'careless disregard'

of whether his actions violated the Act."  CFTC v. Noble Metals

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Int'l, Inc., 67 F.3d 766, 774 (9th Cir. 1995).  "'Mere negligence, mistake, or inadvertence fails to meet Section 4b's scienter requirement.'"  Id. (quoting Wasnick v. Refco, Inc., 911 F.2d 345, 348 (9th Cir. 1990)).  "Scienter has been found when the defendant's conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant 'must have been aware of' the risk."  Commodity Futures Trading Comm'n v. King, 2007 WL 1321762, at *2 (N.D. Tex.) (quoting R.J. Fitzgerald, 310 F.3d at 1328).

For the same reasons that the Court found there was no material dispute of fact that Crombie acted willfully in providing the fraudulent statements to the NFA, the Court also finds that there is no material dispute that he acted with scienter as to the rates of return in the promotional materials.  In addition, Crombie has admitted knowledge that the DDQ contained false information about the amount of assets managed or advised by Paron.  That he knew that the DDQ contained misrepresentations, did not take steps to address these--even if he were not the one who prepared the DDQ--and participated in its distribution demonstrates that he acted in "careless disregard" of whether his actions violated the Act.

c. Materiality

"A statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."  R & W Tech. Servs., Ltd. v. CFTC, 205 F.3d 165, 169 (5th Cir. 2000); see also R.J. Fitzgerald, 310 F.3d at 1332 (finding misrepresentations

material where "an objectively reasonable investor's decision-making process would be substantially affected" by them and they would, "as a matter of law, alter the total mix of relevant information available to the potential commodity option investor").

The USCFTC contends that an objectively reasonable investor's decision-making would have been affected by misrepresentations of the historic rate of return and the amount of assets under management, particularly in light of how dramatically overstated they were. Crombie has not disputed that such misrepresentations would be material to a reasonable investor.

### d. Controlling person liability

The USCFTC argues that, in addition to being directly liable for his own actions, Crombie is also liable for the acts of Paron as a controlling person.

Section 13(b) of the Act provides,

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.

7 U.S.C. § 13c(b). To establish liability under this section, the USCFTC must prove that "the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Id. "To satisfy the latter standard, CFTC must show that the controlling person had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue." R.J. Fitzgerald, 310 F.3d at 1334. "Section 13c(b), therefore, is

59

about power, and imposing liability for those who fail to exercise it to prevent illegal conduct."  Id.

The parties dispute whether Crombie controlled Paron.  The USCFTC argues that Crombie controlled Paron based on the facts that he was a principal of Paron, was its Initial Manager, had a seventy-five percent ownership of it and controlled its trading program.  Crombie argues that he was not the controlling person, because the Operating Agreement placed various limits on his control and because he was in debt to McConnon.  Crombie also argues that McConnon was the controlling person of Paron and should be held liable instead of him.

Even if McConnon could be held liable as a controlling person, this does not preclude Crombie from being deemed a controlling person as well.  See CFTC v. Baragosh, 278 F.3d 319, 330 (4th Cir. 2002) ("Because control may be exercised jointly by a group, several persons may simultaneously be controlling persons of the same corporation.").  To be a control person, the individual "needs to have actually exercised general control over the operations of the wrongdoer," and also "must have had the power or ability--even if not exercised--to control the specific transaction or activity that is alleged to give rise to liability."  Donohoe v. Consolidated Operating & Prod. Corp., 30 F.3d 907, 911-912 (7th Cir. 1994); see also Baragosh, 278 F.3d at 330.

Crombie asserts that he did not have general control over the company because, even though he was the Initial Manager and held a seventy-five percent interest, the operating agreement provided that many decisions had to be approved by a super-majority vote of

United States District Court
For the Northern District of California

at least ninety percent in interest of the members.  Robell Decl. ¶ 3, Ex. 2, 22.  The operating agreement listed twenty-five actions that required a super-majority vote, including "engaging in any activity not authorized by a business plan adopted by a Supermajority Vote of the Members," or "entering into or modifying, amending, extending or terminating any Investment Management Account."  Id.  Because Crombie held a seventy-five percent ownership interest, McConnon a twenty percent interest and Lyons a five percent interest, this clause means that in practical terms, at least McConnon and Crombie had to agree on any of the listed actions for it to take place.  However, that McConnon also had to agree does not mean that Crombie was not a control person. At most, this suggests that both had power and control over the decision, not that Crombie was not in control.

Crombie further asserts that McConnon actually had control because Crombie was in debt to him.  However, Crombie cites no evidence that supports that the fact that Crombie was in debt to McConnon meant that McConnon had effective control.  The operating agreement specifically provided that Crombie alone was to have control over all decisions except those that required a super-majority vote, even though it also provided that Crombie was to get a loan from the company and McConnon.  Thus, the agreement contemplated that he would be in debt to McConnon, yet still gave him general control over the company.  Further, although Crombie contends that McConnon and Lyons were in control of marketing and solicitation, he has admitted that he was actually in control of the trading program itself and that he provided the account statements from his past trading to the auditors.  These were the

United States District Court
For the Northern District of California

core activities which made up the violations and which formed the basis of the fraudulent numbers contained in the marketing documents.  In addition, Crombie has admitted that he edited the marketing documents and thus at least had actual or constructive knowledge of the figures in them, yet allowed them to be used.

Accordingly, the Court finds that there is no material dispute of fact that Crombie is liable as a controlling person for the acts of Paron.

### e. Summary

For the reasons set forth above, the Court finds that there is no material dispute of fact that Crombie violated §§ 4b(a)(1)(A) and (B) and 4o(1)(A) and (B) of the Commodity Exchange Act.  Accordingly, the Court grants the USCFTC's motion for summary judgment on its second and third causes of action against Crombie and denies his cross-motion for summary judgment on these claims.

### 3. Affirmative defenses

Crombie has asserted that he should be granted summary judgment on all claims because "Plaintiff's damages, if any, were not caused by me."  Opp. at 27 (formatting omitted).  However, the USCFTC is a government agency charged with enforcing compliance with the Act by commodity trading professionals and is not seeking damages to remedy a harm to itself, as may have been the case if it were a private litigant seeking damages as a result of the fraud or misconduct.  The USCFTC is not required to prove damages to itself as an element of its case.

Crombie also asserts that he is not liable for the actions of McConnon or Lyons and that he had no control over them, apparently

relying again on his argument that they actually were responsible for writing the marketing documents. However, as explained above, Crombie's liability is the result of his own actions in providing fraudulent documents that served as the basis for the numerical representations made in the promotional materials.

Finally, Crombie claims that the USCFTC's claims against him are barred by unclean hands. The Court notes that this defense was not asserted in his answer. Further, he has not made a showing that this defense may be applicable here.

"[E]quitable defenses against government agencies are strictly limited." SEC v. Elecs. Warehouse, Inc., 689 F. Supp. 53, 73 (D. Conn. 1988) (collecting cases). "Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." Id. "Furthermore, 'courts have permitted the defense only where the alleged misconduct occurred during the investigation leading to the suit and the misconduct prejudiced the defendant in his defense of the action.'" SEC v. Follick, 2002 U.S. Dist. LEXIS 24112, at *23 (S.D.N.Y.) (quoting Elecs. Warehouse, 689 F. Supp. at 73); see also SEC v. Cuban, 798 F. Supp. 2d 783, 794 (N.D. Tex. 2011) (reviewing case law involving government enforcement actions and concluding that, "to the extent the defense of unclean hands is available in an SEC enforcement action, it is in strictly limited circumstances. The SEC's misconduct must be egregious, the misconduct must occur before the SEC files the enforcement action, and the misconduct must result in prejudice to the defense of the enforcement action that rises

United States District Court
For the Northern District of California

to a constitutional level and is established through a direct nexus between the misconduct and the constitutional injury.").

Here, Crombie has not offered evidence that the USCFTC has engaged in misconduct that caused prejudice rising to the constitutional level. He argues, in essence, that the USCFTC did not investigate its claims thoroughly, discredited his evidence and testimony, and relied on the testimony of others. Crombie's allegations do not demonstrate egregious misconduct and, even if true, he has not shown that it prejudiced his defense of this action, especially to a constitutional level.

II. Crombie's motions for leave to file new claims

Crombie moves for leave to file claims against the USCFTC, the NFA, McConnon, Lyons, Paron and the law firm BraunHagey & Borden LLP for negligence, misrepresentation, defamation, fraud or breach of fiduciary duty. Docket Nos. 191 and 194.

The case management order in this action provided that the deadline to add additional parties or claims was March 23, 2012. Docket No. 67. Under Rule 16(b), "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed. R. Civ. Pro. 16(b). Where a schedule has been filed, a party's ability to amend the pleadings is "governed by Rule 16(b), not Rule 15(a)." Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 608 (9th Cir. 1992). Therefore, where, as here, a party seeks to amend a pleading after the date specified in a scheduling order, it must first show "good cause" for the amendment under Rule 16(b). Id.

In order to determine whether good cause exists, courts primarily consider the diligence of the party seeking the

**United States District Court**
For the Northern District of California

1   modification.  Id. at 609; see also Coleman v. Quaker Oats Co.,

2   232 F.3d 1271, 1294 (9th Cir. 2000).  "[N]ot only must parties

3   participate from the outset in creating a workable Rule 16

4   scheduling order but they must also diligently attempt to adhere

5   to that schedule throughout the subsequent course of the

6   litigation."  Jackson v. Laureate, Inc., 186 F.R.D. 605, 607 (E.D.

7   Cal. 1999).

8       If good cause is shown, the party must next demonstrate that

9   the amendment is proper under Rule 15.  Johnson, 975 F.2d at 608.

10  Under that rule, courts consider five factors when assessing the

11  merits of a motion for leave to amend: undue delay, bad faith,

12  futility of amendment, prejudice to the opposing party and whether

13  the plaintiff has previously amended the complaint.  Ahlmeyer v.

14  Nev. Sys. of Higher Educ., 555 F.3d 1051, 1055 n.3 (9th Cir.

15  2009).  Although these five factors are generally all considered,

16  "futility of amendment alone can justify the denial of a motion."

17  Id. at 1055.

18      Even if Crombie had made a showing that he acted diligently

19  in seeking a modification of the schedule of this case, his

20  proposed amendments would be futile for a variety of reasons.

21  First, as an agency of the United States, the USCFTC is immune to

22  suit, in the absence of a waiver of sovereign immunity, on

23  Crombie's claims.  Crombie has made no showing that any such

24  waiver is applicable here.  See also United States v. Agnew, 423

25  F.2d 513, 514 (9th Cir. 1970) ("The filing of a suit in the name

26  of the United States does not amount to a waiver of sovereign

27  immunity subjecting the United States to an affirmative adverse

28  judgment on a counterclaim filed by the defendant.").

1    Further, many of Crombie's allegations against the USCFTC,

2  NFA and BraunHagey are barred by California's litigation

3  privilege.  Crombie alleges, for example, that the USCFTC was

4  "reckless and grossly negligent in bringing the complaint and

5  amended complaint," causing him harm, and that BraunHagey made

6  unfounded, untrue statements about him "in litigation."  Such

7  allegations are not actionable due to the litigation privilege,

8  which, as explained by the California Supreme Court, is intended

9  "to afford litigants . . . the utmost freedom of access to the

10  courts without fear of being harassed subsequently by derivative

11  tort actions."  Silberg v. Anderson, 50 Cal. 3d 205, 213 (1990).

12  "The litigation privilege applies to any communications (1) made

13  in a judicial proceeding; (2) by litigants or other participants

14  authorized by law; (3) to achieve the objects of the litigation;

15  (4) that have some connection or logical relation to the action."

16  Sharper Image Corp. v. Target Corp., 425 F. Supp. 2d 1056, 1077

17  (N.D. Cal. 2006) (citing Silberg, 50 Cal. 3d at 212).  The

18  privilege also applies to "prelitigation communication" that

19  "relates to litigation that is contemplated in good faith and

20  under serious consideration."  Action Apartment Ass'n Inc. v. City

21  of Santa Monica, 41 Cal. 4th 1232, 1251 (2007).

22    In addition, as Paron, McConnon and Lyons argued in

23  opposition to Crombie's first motion for leave to amend, the

24  claims that he seeks to assert against them are barred by res

25  judicata.  Crombie alleges, among other things, that McConnon and

26  Lyons made false and misleading statements in Paron marketing and

27  solicitation materials and in connection with the Rothstein Kass

28  and Yulish reports and the NFA investigation.  These, and the

United States District Court
For the Northern District of California

other related issues raised by Crombie, were previously at issue
in the Delaware litigation and were resolved on their merits
adversely to Crombie.  Accordingly, his attempt to re-litigate
these issues is futile.

Finally, Crombie does not seek to assert proper third-party
claims under Federal Rule of Civil Procedure 14.  Rule 14(a)
provides that "a defending party, as a third-party plaintiff, may
cause a summons and complaint to be served upon a person not a
party to the action who is or may be liable to the third-party
plaintiff for all or part of the plaintiff's claim against the
third-party plaintiff."  As the Ninth Circuit instructs, a "third-
party claim may be asserted only when the third party's liability
is in some way dependent on the outcome of the main claim and is
secondary or derivative thereto."  Stewart v. Am. Int'l Oil & Gas
Co., 845 F.2d 196, 199-200 (9th Cir. 1988) (affirming dismissal of
third-party complaint when it failed to show the requisite
derivative or secondary liability on the part of the third-party
defendants).  Quoting Professors Wright and Miller, the court in
Stewart explained, "The crucial characteristic of a Rule 14 claim
is that the defendant is attempting to transfer to the third-party
defendant the liability asserted against him by the original
plaintiff.  The mere fact that the alleged third-party claim
arises from the same transaction or set of facts as the original
claim is not enough."  Id. at 200 (quoting 6 Wright & Miller, Fed.
Practice & Proc. § 1446 at 257 (1971 ed.)).  Here, at most,
Crombie's purported third-party claims arise from the same
transaction or set of facts as the original claims.  Accordingly,
allowing him to amend to assert them would be futile.

United States District Court
For the Northern District of California

CONCLUSION

For the reasons set forth above, the Court GRANTS the USCFTC's motion for summary judgment (Docket No. 234) and DENIES Crombie's cross-motion for summary judgment (Docket No. 252) and motions for leave to file counterclaims and third-party claims (Docket Nos. 191, 194).

In its motion for summary judgment, the USCFTC did not address the relief it seeks to address the violations of the Commodity Exchange Act for which Crombie has been found liable. Within two weeks of the date of this Order, the USCFTC shall file a motion addressing the relief that it seeks and shall include a proposed judgment. Within two weeks thereafter, Crombie may file an opposition to the USCFTC's motion. Any reply is due one week later. The motion will be resolved on the papers.

IT IS SO ORDERED.

Dated: 7/26/2013

CLAUDIA WILKEN
United States District Judge